**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

WAYNE BOONE, # 357-769                    *

      Plaintiff                              *

          v                              *            Civil Action No. DKC-13-1135

BOBBY SHEARIN, et al.                      *

      Defendants                           *
                                   ***

## MEMORANDUM OPINION

Wayne Boone ("Boone") filed this 42 U.S.C. § 1983 prisoner civil rights action presenting claims arising from an incident on December 17, 2012 at North Branch Correctional Institution ("NBCI") in Hagerstown, Maryland.  Defendant Kristi Cortez ("Cortez"), R.N., by her counsel, filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 11).  Boone was granted leave to amend the Complaint (ECF Nos. 18 and 19), and Cortez filed a Motion to Dismiss the Amended Complaint or, in the Alternative, Motion for Summary Judgment. (ECF No. 22).  Boone responded. (ECF Nos. 23 and 30).  Defendants Warden Bobby P. Shearin,[1] Lt. Calvin Jones, C.O. II Michael Stallings, C.O. II Joshua Tart and C.O. II Shawn Murray ("State Defendants'), by their counsel, filed a Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment (ECF No. 32) to which Boone has responded. (ECF Nos. 39-42).

---

[1]   Bobby Shearin was warden at North Branch Correctional Institution ("NBCI") at the time of the incident.  The court will grant Boone's motion to substitute Frank Bishop, Jr., the present warden at NBCI, as Defendant.  (ECF No. 44).  *See also*  Fed. R. Civ. P. 25(d) (1) (substitution of officials).  Regardless of the fact of substitution, former Warden Bishop will be dismissed as Defendant for reasons set forth herein.

An oral hearing in this matter is unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons stated below, Warden Shearin will be dismissed as a party defendant and summary judgment will be entered in favor of Cortez and the State Defendants as to all claims.

## Background

Boone claims that the State Defendants used excessive force against him on December 17, 2012, and, with Cortez, attempted to cover-up the incident by "falsifying reports." (ECF No. 1 at 5; ECF No. 18). Further, he claims that Cortez contributed to the constitutional violation because she knew what was happening and did not try to stop it or seek help. As relief, he requests fifty thousand dollars ($50,000.00) each in compensatory and punitive damages against C.O. II Stallings, C.O. II Murray and C.O. II Tart, and twenty thousand dollars ($20,000.00) in punitive damages each against Nurse Cortez and Lt. Jones. *Id.* Boone also requests injunctive relief to remove[2] the Defendants involved in the incident or to transfer Boone another institution with the same security level.

### A. Boone's Allegations

On December 17, 2012, Boone was escorted by Officer Tart to the NBCI medical department for complaints of chest pain. When he arrived at the medical department, C.O. II Stallings ("Stallings) was standing in the doorway and was conversing with Nurse Cortez. Boone sat on the examination table for several minutes while their conversation continued. At some point, Boone asked Cortez if she was going to do her job. (ECF Nos. 1 and 36 at 3). Nurse Cortez told Boone to "shut up," and Boone acknowledges that he then called her a "bitch." (ECF

---

[2] The court shall assume Boone seeks to have Defendants terminated from their jobs at NBCI. Boone provides no legal or factual predicate to support injunctive relief requested in the Complaint (ECF No. 1 at 5) and fails to satisfy the preliminary injunction standard set forth in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Federal Election Commission*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds, _U.S._, 130 S.Ct. 2371 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

No. 1 at 4-5). Boone then attempted to leave the room, but Stallings positioned himself in the doorway and threatened to use pepper spray. Boone concedes that he "did not comply, instead, tried to explain himself." Boone explains that Cortez showed disrespect by telling him to shut up. (ECF No. 36 at 4). Boone attempted to walk away, but Stallings and Tart followed behind him and threatened to use pepper spray. *Id*. Boone turned around and placed his hands behind his back. Instead of handcuffing Boone, Stallings approached him from behind and grabbed him. (ECF No. 1 at 4-5). Boone felt "threatened" and acknowledges that he attempted to pull his arm away from Stallings. *Id*; ECF No. 36 at 5. Tart then grabbed Boone's arm and slammed him to the ground. (ECF No. 36 at 5). Once Boone was on the ground, Stallings repeatedly punched and kicked him. Tart then rammed a knee into Boone's rib area and handcuffed him. *Id*. Boone states that he did not "swing, strike or attempt to hit any officials." (*Id*. at 6).

After Boone was taken to the ground and handcuffed, a third officer, C.O. II Murray ("Murray") poked Boone in his left eye with the nozzle of a pepper spray can. Murray then sprayed Boone in the face with the pepper spray. (*Id*. at 4). Boone states that he sustained broken blood vessels in his eye, a corneal abrasion, and a laceration under his eye. Boone avers that he continues to have blurred vision and pain in his left eye. Additionally, Boone suffered a cut on his right elbow and bruises "all over his body including a boot print." *Id*.

Boone, who viewed the DVD recording of the incident filed by the State Defendants to support their dispositive motion (ECF Nos. 37 and 38), asserts that he did "nothing to warrant being kicked, punched and maced.[3] The defendants did this …. because he referred to K. Cortez as a bitch." (ECF No. 1 at 5).

---

[3] The record shows pepper spray, not mace, was used in the incident.

Boone claims that Defendant Cortez knew that he would be assaulted. He asserts that the institutional video recording of the incident shows that right after Cortez walked out of the medical room without looking back, he was assaulted by the correctional officers. (ECF No. 39 at 3-4). Boone reasons that this shows Cortez "knew what was taking place." *Id*.

Boone has filed two declarations. (ECF No. 36, Exhibit 19 at 1-5 and ECF No. 42). He attests that: 1) on December 17, 2012, he "did not fight with officers or resist handcuffs"; 2) he "did not threaten K. Cortez with harm," nor "directly call her a female dog"; and 3) he was addressing others when he referred to Cortez using the word. (ECF No. 42). Boone states that he fears that Officer Murray and other unnamed correctional officers will harm him. (ECF No. 36, Exhibit 19 at 4). Boone states that he is afraid to eat meals provided by Murray, and has lost more than thirty pounds due to stress and missed meals. *Id*.

### B.     Defendants' Exhibits and Declarations

#### 1.     Kristi Cortez, R.N.

Cortez, a registered nurse employed by Wexford Health Services, Inc. at NBCI, attests to the following facts in her declaration. On December 17, 2012, at 2:19 p.m,[4] she saw Boone for his complaints of chest discomfort. (ECF No. 11, Exhibit 2). The medical chart of the visit shows that Boone was alert and oriented; his gait was steady and his breathing unlabored. (ECF No. 11, Exhibit 1 at 17-18). His skin appeared dry and no jugular venous distention was observed.[5] During the course of the evaluation, Boone went to weigh himself. He "became agitated and stated "'I'm a smack the fuck outta (sic) this bitch if she don't do her job.'"

---

[4]  Other declarations and exhibits uniformly show the incident occurred at approximately 12:45 pm. *See e.g.* ECF No. 32 Exhibits 1 ¶ 4, 3 ¶ 4, and 4A (DVD).

[5] Jugular venous distension or engorgement is an indication of obstruction to the return of blood to the right atrium suggestive of congestive heart failure. (ECF No. 11, Memorandum n. 1, citing http://medical-dictionary.thefreedictionary.com/jugular+vein+distention).

(parenthesis in original). In response, correctional officers who were present requested that Boone "cuff up" for transport and removal from the medical unit in light of the offensive remarks. Boone became more agitated, stood, stepped on Cortez's left foot, and punched one of the correctional officers in the left side of the face. *Id*. Cortez states that she was removed from the room for her safety by officers responding to the incident, and did not participate in the use of force. Cortez had no further involvement in Boone's medical care. Cortez denies falsifying Boone's medical records or providing "a false factual accounting of how the incident occurred" to any medical or Department of Public Safety and Correctional Services staff. *Id.*

## 2. Medical Records

Cortez has filed copies of Boone's medical records showing that Kimberly Delozier, LPN examined Boone at 3:03 the same day. (ECF No. 11, Exhibit 1 at 19). The medical records report that Boone was not in apparent stress. His left eye was swollen shut with evidence of dried blood coming from the eye area. *Id*. Boone's heart rhythm was normal and his pulse slightly elevated. *Id*. Boone was referred to a physician for further assessment of his eye injury. *Id*.

On December 21, 2012, Boone submitted a sick call slip for examination of his left eye which he reported was "blurry and painful" in the light. *Id*. at 70. On December 26, 2012, Jonas Merill, a physicians' assistant, examined Boone for eye pain. Boone reported recent eye trauma but provided no details. *Id*. Plaintiff was diagnosed with a superficial corneal injury, provided Tobradex eye drops,[6] and referred to a physician for further examination. Boone indicated that the blurred vision had resolved. *Id.* On January 10, 2013, Michael Summerfield, M.D., an ophthalmologist, examined Boone's left eye injury. *Id*. at 70. Boone told Dr. Summerfield that

---

[6]  Tobradex is an antibiotic and steroid medication used to treat bacterial infection and swelling of the eye associated with bacterial infections of the eye. (ECF No. 11, Memorandum n. 3, citing http:/www.drugs.com/mtm /tobradex.html).

he had been hit with the nozzle of the pepper spray can in his left eye resulting in bleeding and discomfort. *Id.* Boone indicated that Tobradex had helped and denied suffering any flashes of light or floaters. Dr. Summerfield noted no evidence of orbital fracture, retinal detachment, retinal tears or other ocular abnormalities. *Id.*

C.     **State Defendants**

1.     **Declarations**

The declarations filed by the State Defendants in support of their Motion for Summary Judgment are summarized below.

**<u>C.O II Joshua Tart:</u>** Tart states that on the day of the incident and at approximately 12:45 p.m. he escorted Boone to the medical room for complaints of chest pain. Nurse Cortez, R.N., began interviewing Boone about his medical complaint and Tart heard him say to Cortez: "Are you going to fucking do your job or what?" (ECF No. 32, Exhibit 1 ¶ 4). Immediately after making that comment, Boone said: "I'm going to smack the fuck out of this bitch if she ain't gonna do her job!" *Id.* Tart and C.O. II Michael Stallings, who was assisting with inmate escort duties, ordered Boone to "cuff up." Boone refused to follow the order. *Id.* At that point, Boone stood up from the examination table where he had been seated, and placed his foot on top of Cortez's left foot. *Id.* at ¶ 5. Fearing for Cortez's safety, Tart and Stallings approached Boone. Boone then removed his foot from the nurse and she left the room. Tart and Stallings again ordered Boone to "cuff up"; however, when Stallings approached Boone to place him in hand restraints, Boone struck Stallings with a closed fist on the left side of the officer's face. *Id.* ¶ 6. Tart states that Boone shoved Stallings against the wall and punched him. *Id.* Boone continued to resist, and, only after Officer Murray applied a burst of pepper spray to Boone's face, were the officers able to apply the hand restraints. *Id.* Boone was examined by medical staff after he

6

stopped resisting and order was restored.  *Id.* ¶ 8.  Boone refused a decontamination shower.  *Id.* ¶ 9.[7]  Tart attests that at no time did he witness anyone intentionally harm Boone during the incident.  He states the force used was the amount of force necessary to protect staff and to bring the situation under control.  *Id.* ¶ 10. After Boone was handcuffed and no longer combative, no further chemical agents or force was utilized.  *Id.*

**C.O. II Michael Stallings:**  Stallings attests that on December 17, 2012, he was a part of an escort team assigned to escort inmates to medical appointments. While standing at the doorway of the medical room, C.O. II Stallings heard Boone say to Cortez: "Are you going to do your fucking job or what?"  Boone then stated: "I'm about to smack the fuck out of this bitch if she can't do her job!" (ECF No. 32, Exhibit No. 2 at ¶ 4).  Upon hearing these comments and fearing for the safety of the nurse, Stallings and Tart ordered Boone to "cuff up."  *Id.*  Boone refused to comply with their order.  C.O. II Stallings states that he and Tart gave Boone several more orders to "cuff up," but Boone continued to refuse to comply.  *Id.*  At that point, Boone stood up from the examination table where he had been sitting, and appeared deliberately to place his foot on the top of Cortez's foot, so Tart and Stallings approached Boone, who then removed his foot from atop the nurse's foot.  The nurse quickly exited the examination room.  *Id.* at ¶ 5.  Stallings then approached Boone to apply the hand restraints, at which point Boone struck him in the face with a closed fist.  *Id.* ¶ 6.  Stallings attests that Boone then pushed him against the wall of the examination room and punched him with his closed fist.   Tart took hold of Boone and when he did so, both Tart and Boone fell to the floor.  *Id.*  Murray, who was in the immediate area, responded and applied a short burst of pepper spray to Boone's facial area.

---

[7]  Boone disputes that he was offered a decontamination shower. (ECF No. 36, Exhibit 1 at 3).

Although Boone continued to struggle and resist the hand restraints, Sgt. Youngblood,[8] Murray, Tart and Stallings were eventually able to gain control of Boone and restrain him enough to apply the hand restraints. *Id.* Stallings states under oath that Boone was then escorted to a holding cell where he was examined by medical personnel. *Id.* at ¶ 7. At the completion of the medical examination, Boone was offered and refused a decontamination shower. Stallings states that at no time did he or anyone else in his presence attempt to harm Boone during the incident, and the force used was solely for the purpose of bringing a recalcitrant inmate under control in order to restrain him for the protection of staff and himself. *Id.* at ¶ 8.

**C.O.II Shawn Murray** states in his declaration that on December 17, 2012, at approximately 12:45 p.m. he heard loud noises coming from the medical exam room, and when he went to investigate, he observed Stallings and Tart struggling with Boone in an effort to apply hand restraints (ECF No. 32, Exhibit 3). During the struggle, the officers and Boone fell to the floor, so Murray called for assistance on his radio. Murray states that after calling for assistance, he approached Boone who continued to struggle with Tart and Stallings on the ground, so he applied a short burst of pepper spray to Boone's facial area, and the officers were able to restrain Boone in handcuffs. *Id.* at ¶ 5. Murray attests that once the hand restraints were applied, Boone stopped struggling with the officers and no additional force was needed or used. *Id.* at ¶ 6. Murray attests that pepper spray was administered prior to plaintiff being handcuffed, and at no time did he nor anyone in his presence use the nozzle of the pepper spray canister to poke Plaintiff in his eye. *Id.* at ¶ 8.

---

[8]   The State Defendants have not filed an affidavit for Sergeant Youngblood because she is on extended sick leave. (ECF No. 32, Memorandum n. 3).

## 2.        Internal Investigation Unit Report

On December 17, 2012, the Internal Investigative Unit (IIU) was notified of an assault on staff at NBCI.  (ECF No. 32, Exhibit No. 4 at 4-5 and Exhibit No. 4A5 (DVD)).  Boone wrote in the Inmate Statement for the investigation that the nurse was "disrespectful and rude," so he asked the officers to "get [him] the fuck out of there, this bitch don't know how to talk to people." *Id*. at 7 and 30.   Boone recounted to the investigator that Stallings grabbed him and attempted to cuff him and a "tussle" ensued.  *Id*. at 7.  Boone claimed that during the "tussle" Stallings attempted to gouge his eye and called him a "nigger."  *Id*.  Boone stated that his vision remains blurred in his left eye.  *Id*.

The investigator also interviewed Officer Stallings. The report found that Stallings' statements were consistent with his written report.  *Id*. at 7.  It was noted that Stallings later drove himself to the Western Maryland Regional Medical Center for treatment.  When interviewed, Nurse Cortez told the investigator that Boone assaulted Stallings.  *Id*. at 32-33.

The IIU investigative report noted that the video did not capture the assault on Stallings. *Id*. at 6.  Also in the report was the declaration of Lt. Calvin Jones, attesting that he did not omit, erase or otherwise tamper with the DVD video footage of the incident.  (ECF No. 32, Exhibit 4B, ¶ 4).  Boone was issued a notice of infraction and charged with criminal assault.[9]  At the time of the IIU investigation, no trial date had been scheduled. (ECF No. 32, Exhibit No. 4 at 6-7, 27- 29 and 47-50). The IIU investigative report noted that the video did not show Boone assaulting Officer Stallings. *Id*. at 6; *see also*, Exhibit No. 4A. The investigation concluded that Boone assaulted Stallings by striking him with a closed fist several times as he struggled with officers as they attempted to gain control of him to apply hand restraints.  *Id*. at 5-6.  The report determined

---

[9]  The criminal charges brought against Boone were later dismissed *nolle prosequi*.  *See infra*  p. 10.

that no further investigative action would be taken by the IIU and the case was closed.  (ECF No. Exhibit 4 at 8).

### 3.    DVD

The DVD shows the medical room where the incident occurred as viewed from a hallway through an open door.  There is a large window through which some of the activity inside can be seen.  It shows Boone entering the medical room, stopping by the window to get on the scale briefly, and then a few moments later talking with the officers who were standing by the doorway.  Boone then walked back into the medical room, out of sight.  Shortly thereafter, Nurse Cortez exited.  A partial view of a struggle, which lasts about a minute, then can be seen.  The individual participants cannot be discerned.  Careful viewing of the tape appears to show that at first, the officers were standing a couple of feet away from Boone who is out of view.  Once the physical struggle begins, not much is visible.  Boone can eventually be seen on the floor with the officers and his arm is brought out from under his body.  Once that occurs, the arm appears to be restrained, and the chaotic pace of action shown in the room returned to normal.  Shortly after, Boone was escorted out of the room by the officers in full view of the camera.  The incident lasts about one minute.  There is no audio for the recording and the view presented is too distant and obstructed to confirm or contradict the parties' accounts of the incident.

### 4.    Assault Charges

Boone was charged in the Circuit Court for Allegany County with two counts of second-degree assault and one count of second-degree assault against a Division of Correction employee in case number 01K13015249.  The charges against were dismissed *nolle prosequi* on September 11, 2013. (ECF No. 32, Exhibit No. 7).

### 5.    Adjustment Hearing

At his adjustment hearing on January 4, 2013, Plaintiff was found guilty of violating Rule #400 (disobeying a direct lawful order) and Rule #405 (any exhibition, demonstration or conveyance of insolence, disrespect, or vulgar language), and received 45 days of disciplinary segregation and 10 days of cell restriction, but did not receive any loss of good conduct credits (ECF No. 32, Exhibit No. 6).   Boone was found not guilty of violating Rule #101 (assault or battery on staff). (ECF No. 23, Exhibit 1 at 5).[10]

The hearing officer's decision (ECF No. 23, Exhibit 1)[11] reads in part:

> Hearing Officer considered Notice of Inmate Rule Violation by CO Stallings, Use of Force Reports, photo printouts, and video footage of the incident, as well as statements of Wayne Boone and representative. Boone's defense is that Officer Stallings did not escort him to medical room but was leaning in the doorway talking to the nurse when he arrived escorted by Officer Tart, and the nurse (Cortez) continued to speak to the officer after he arrived so he asked her if she was going to do her job, and the nurse replied, "shut up" and Boone then attempted to leave and Officer Stallings blocked his exit and told him to "cuffup" and Boone asked why he had to cuffup stating that the bitch (nurse) did not know how to talk to people, and the officer took out his mace and grabbed him and a tussel [sic] ensued and Sgt. Youngblood came in and pulled Stallings off of him and Officer Murray maced him directly in the face while he was on the ground causing damage to his eye, and he did not strike Stallings, and any bruising on Stalling [sic] face occurred while the tussel [sic] occurred and Stallings' hands are swollen from striking him. Hearing Officer finds that the video recording of the incident clearly shows Stallings did not escort Boone to the medical room. Stallings was leaning in the door, and when Boone arrived with Officer Tart. Boone entered the medical room, stepped on the scale, and moved to an area of the room out of view. A few minutes later Boone walks toward the doorway. Officer Stallings and Officer Tart were in the doorway. Stallings was leaning against the door frame and moved into the doorway, blocking Boone from exiting. Boone had his hands to his side speaking to the officer, and then Stallings pulled the pepper spray fogger from his belt. Boone turned his back and walked away from Stallings, back into the medical room. Stallings and Tart followed Boone into the medical room, and the nurse walked out of the medical room and stood

---

[10]   Defendants incorrectly state that Boone was not charged with violating Rule 101 (assault or battery on staff). (ECF No. 32 memorandum at 9).   A copy of the hearing examiner's decision was filed by Boone and refutes this assertion.  ECF No. 23, Exhibit 1 at 4 (page 5 of 6).

[11]   Boone filed  a copy of the decision of the hearing officer. (ECF No. 23, Exhibit 1).

with her back against the wall just outside of the door. Hearing Officer does not believe Boone was anyway near the nurse, or that Boone stepped on the nurse's foot. It appeared as if the nurse had been asked to step out of the room. Shortly after the nurse positioned herself with her back to the wall outside of the treatment room, a scuffle began inside of the room, and the nurse walked away from the medical room, without looking back. Hearing Officer does not believe the nurse observed any of the incident, as Boone, Stallings and Tart were simply standing inside of the room when she walked out and stood outside against the wall. Hearing Officer finds that, by his own admission, Boone refered [sic] to the nurse as a "bitch" and did not submit to handcuffs when ordered to do so. Hearing Officer finds Boone guilty of rules 400 and 405.Hearing Officer finds Boone not guilty of rule 101. Hearing Officer finds that Officer Stallings failed to document that Boone attempted to leave the medical room and Stallings moved in front and physically blocked Boone's exit and pulled the pepper spray from his belt. Boone turned his back and walked away from the officers, back into the medical room. Both Officers Stallings (with mace can still in his hand) and Officer Tart followed Boone into the medical room, at which point the nurse walked out of the room. Hearing Officer finds the Notice by Officer Stallings and the Use of Force reports are not consistent with what is shown on the video. The description of events as presented by Wayne Boone is much more consistent with what can be seen on the video footage of the incident. Hearing Officer does not believe that Boone was able to push Officer Stallings against the wall and punch him several times. Officer Stallings had a large canister of mace in his hand when he followed Boone into the medical room. Any movement toward the officer on Boone's part could easily have been diverted with the mace that was already in hand. Hearing Officer finds Boone not guilty of Rule 101.

ECF No. 23, Exhibit 1 at 4 (page 5 of 6).

Plaintiff filed ARP NBCI #0087-13 on January 4, 2013, and ARP NBCI #0086-13 on January 5, 2013. ECF No. 32, Exhibit No. 8. In ARP #0087-13, Boone complained that he was subjected to excessive use of force on December 17, 2012, and in ARP #0086-13, he complained that he was falsely accused of assault and also alleged that Nurse Cortez engaged in misconduct. *Id.* Both ARPs were dismissed for procedural reasons at the institutional level and on appeal because the incident was being investigated by the IIU. *Id.*

### Standard of Review

Mindful that Boone is proceeding *pro se*, this court must liberally construe his pleadings. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Haines v. Kerner*, 404 U.S. 519, 520 (1972)

(pleadings filed by a *pro se* litigant are held "to less stringent standards than formal pleadings drafted by lawyers).

## A.    Motion to Dismiss

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) tests the sufficiency of a plaintiff's complaint. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id*. at 563. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Commissioners*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *see United Black Firefighters v. Hirst,* 604 F.2d 844, 847 (4th Cir. 1979).

## B.    Motion for Summary Judgment

Summary Judgment is governed by Fed.R.Civ.P. 56(a) which provides summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. This does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court should "view the evidence in the light most favorable to ... the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644–45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

In considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility

to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## Discussion

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of a federal constitutional right or a right secured by federal law. *See Baker v. McCollan*, 443 U.S. 137 (1979).

### A.      Claims Against Warden

A defendant must have been personally involved in the allegedly unconstitutional action or omission to act to be liable in a §1983 action. *See West v. Atkins*, 815 F.2d 993 (4th Cir. 1987). Boone does not allege any direct involvement by either then Warden Shearin or Warden Bishop in this incident.

To the extent Boone names either Warden as Defendant based on his supervisory role, a defendant in a § 1983 action may not be held liable based upon the theory of *respondeat superior*.[12] *See Iqbal*, 556 U.S. 662, 676 (2009); *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Instead, supervisory liability is "determined 'by pinpointing the persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked.'" *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994) (quoting *Slakan v. Porter*, 737 F.2d 368, 372–73 (4th Cir. 1984)). "Supervisory liability under § 1983 must be supported with evidence: 1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; 2) the supervisor's response to the knowledge was so inadequate as to show deliberate

---

[12] *Respondeat superior* is a legal doctrine whereby an employer may be held responsible for employees.

indifference to or tacit authorization of the alleged offensive practices; and 3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw*, 13 F.3d at 799. This case does not satisfy the standard for assigning supervisory liability; consequently, the claim against Warden Shearin and Warden Bishop will be dismissed.

**B.      Excessive Force**

A convicted inmate's claim of use of excessive physical force is examined in the context of the Eighth Amendment's prohibition against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319–21 (1986); *see also Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1176–78 (2010) (per curiam); *Hudson v. McMillan*, 503 U.S. 1, 7–9 (1992). Eighth Amendment analysis asks whether the prison officials "acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component)." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). In a claim for excessive application of force, a claimant must meet a heavy burden to satisfy the subjective component—that correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). To satisfy the subjective component, a claimant must show that a prison official acted with a "sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991).

> Under an Eighth Amendment standard, whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7. A court must consider the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison

officials; and any efforts made to temper the severity of the response. See *Whitley*, 475 U.S. at 321. The absence of significant injury alone is not dispositive of a claim of excessive force, however. *Wilkins*, 130 S.Ct. at 1178. Rather, the extent of injury is one factor indicative of whether the force used was appropriate in a particular situation. But, if force is applied maliciously and sadistically, liability is not avoided simply because the prisoner had "the good fortune to escape" serious harm. *Wilkins*, 130 S.Ct. at 1179. As the Court said in *Wilkins*: "Injury and force ... are only imperfectly correlative, and it is the latter that ultimately counts." *Id*. at 1178.

*Haskins v. Hawk*, 2013 WL 1314194, 25 (D.Md.,2013)

Prison officials are charged with balancing competing governmental interests, such as the maintenance of order; protection of correctional officers, prison staff and other inmates; and inmates' rights to be free from cruel and unusual punishment. *See Whitley*, 475 U.S. at 321. When correctional officers use force to keep order, they have little time for considered reflection and must quickly and decisively balance the need to maintain order and restore discipline through force against the risk of injury to inmates. *See Hudson*, 503 U.S. at 6. Thus, in excessive force cases, the subjective component is measured by the same standard as the objective: "whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. at 7.

Although there are facts in this case in dispute, those disputes are not material because Boone's own account, confirmed by the hearing examiner, unequivocally demonstrates his own misconduct justifying some forceful response by the correctional officers. He concedes that he asked Cortez when she was going to do her job, and then either directly or indirectly called her a "bitch" in her presence. He acknowledges that he was directed by a correctional officer to "cuff up," but instead of complying, asked for an explanation why. Boone also acknowledges that when he stood against a wall to be handcuffed, he pulled his arm away from the officer's because

Boone felt threatened. Boone attests that he did not swing at or strike the correctional officers. He does not address Defendants' contention that he stepped on Cortez's foot.

The officers involved attest that pepper spray was used to enable them to place handcuffs on Boone. Once Boone was restrained, he was taken to a holding cell. The parties dispute whether Boone was offered and refused a shower, but Boone does not allege he suffered injury from the absence of a shower. Defendants assert the force was necessary, measured, and undertaken to maintain safety and security.

Even with the facts viewed in the light most favorable to him, Boone has not satisfied the heavy burden required to show that the correctional officers applied force "maliciously and sadistically for the very purpose of causing harm," rather than "in a good-faith effort to maintain or restore discipline." *Whitley*, 475 U.S. at 320–21 (internal quotation marks omitted). What he claims happened was not an unprovoked attack on him. Rather, he verbally challenged the nurse and then disobeyed direct orders. The officers, objectively and subjectively interpreted his actions to constitute a threat and applied force in a good faith effort to maintain discipline. His assertions that Cortez is responsible because she deliberately ignored the imminent assault falters both because the correctional officers have not been shown to have violated his constitutional rights, but also because his speculation about her own motivation in leaving the room and walking away is not evidence. Based on the record, there is no demonstration of a violation of constitutional proportion. The State Defendants' Motion for Summary judgment as to the excessive force claim will be granted. Summary judgment will be entered on this claim.

### C. Falsification of Records

Boone claims that the State Defendants and Cortez acted in concert to falsify records of the incident, although it is not clear that he means to raise this as a freestanding, separate

allegation.[13] He alleges that Cortez, Stallings, and Calvin Jones "attempted to cover up the incident by falsifying reports. Calvin Jones also omitted parts of the video footage of the incident." (ECF No. 1 at 5). Specifically, Boone alleges the DVD was altered because it does not move at normal speed and was "spliced." (ECF No. 40 at 3). Further, Boone asserts the sequence of events shown on the DVD and Cortez's declaration that she witnessed the assault on Officer Stallings and left the medical room demonstrates the DVD was altered. (ECF No. 23 at 7; ECF 40 at 3).

The State Defendants have submitted a declaration denying the DVD was altered. As noted in the IIU Report, the DVD does not capture any assault on Officer Stallings. After viewing the DVD, the court does not find alteration to be apparent. The discrepancies in recollections, written reports, and the DVD appear to be no more than typical differences in perception and memory of a brief and spontaneous incident and belie Boone's claim that Defendants acted in concert to alter records. The hearing officer found Boone not guilty of assault, partly as a result of the inability to be certain what happened due to the discrepancies. There is no separate due process claim presented on this record. *Carrero-Vasquez v. Linn*, 2014 WL 183819 * 6 (D.Md. 2014)(citing *Freeman v. Rideout*, 808 F.2d 949 (2d Cir. 1986).

### D.    Retaliation

In order to prevail on a claim of retaliation, a plaintiff must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right. *Adams v. Rice,* 40 F.3d 72, 75 (4th Cir. 1994). A complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleading alone. *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713

---

[13] He disclaims any intent to allege a separate claim for deprivation of a liberty interest from being falsely accused, citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). ECF No. 30 at 3-4.

F.2d 10, 13 (2nd Cir. 1983). Retaliation, though it is not expressly referred to in the Constitution, is actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim. *ACLU of Maryland, Inc. v. Wicomico County, Md.* 999 F.2d 780, 785 (4th Cir. 1993)

"In the prison context, we treat such claims with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996), quoting *Adams v. Rice*, 40 F.3d at 74. A plaintiff "[b]ears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). To make out a prima facie case of retaliation, a plaintiff has the burden of showing that retaliation for the exercise of protected conduct was the "substantial" or "motivating" factor behind the conduct of Defendants. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).

Boone attests to fearing harm at the hands of Officer Murray and other unnamed correctional officers. Boone states that he does not want to eat food provided by Murray, but provides no factual basis to show why food Murray or others provide might be tainted or harmful. Moreover, he fails to indicate what constitutionally protected right is implicated. Thus, even when the facts are regarded in the light most favorable to Boone, there is no genuine issue

of material fact and the State Defendants are entitled to summary judgment in their favor as a matter of law as to this claim.[14]

### E. Inadequate Medical Care

Boone does not mention denial of medical care in his filings, and, in any event, has not stated or presented a claim in that regard. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *See Gregg v. Georgia*, 428 U.S. 153, 173 (1976). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of defendants (or their failure to act) amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Proof of an objectively serious medical condition, however, does not end the inquiry. The second component of proof requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995),

---

[14] On March 10, 2014, Boone filed a Motion for a Preliminary Injunction (ECF No. 46), alleging that on February 28, 2014, Officer Tart affixed handcuffs on Boone so tightly that Boone's wrist was cut. Boone states that he fears for his safety and requests a transfer to another facility. This eleventh hour Motion does not meet the standards for issuance of preliminary injunctive relief, and will be dismissed without prejudice to refiling in the event Boone intends to pursue his claim.

quoting *Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris* 240 F. 3d 383 (4th Cir. 2001), citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

To the extent Boone claims that Cortez provided inadequate medical treatment for him on December 17, 2012, he does not dispute the medical records provided by Cortez which show she provided him a brief medical evaluation prior to the incident for his chest pain. Boone's claims that she "knew" he was about to be assaulted when she left the medical room are speculative. After the incident, it is undisputed that Cortez did not provide any additional medical treatment for Boone. His medical needs were attended to by other providers. Further, the court takes notice that as an employee of the institutional medical provider, Cortez had neither authority nor responsibility for maintaining institutional security. Indeed, the record suggests that Cortez was instructed by correctional officers to leave the room for her own safety.

### Conclusion

For the above reasons, the court shall dismiss the Warden, and grant summary judgment in favor of Cortez and the State Defendants as to all remaining claims. A separate order follows.


Date: __March 18, 2014__            _____/s/_____
                                       DEBORAH K. CHASANOW
                                       United States District Judge